**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kingsley Capital Management, LLC, and Bruce Paine Kingsley MD IRA Rollover, | No. CV10-02243-PHX-NVW |
| Plaintiffs, | **ORDER** |
| vs. | |
| Brian Nelson Sly, a married man; Brian Sly and Company, Inc., a California corporation and successor to Brian Sly and Company, a sole proprietorship; Wilbur Anthony Huff, an individual; Charles J. Antonucci, Sr., an individual; Thomas J. Bean, an individual; Thomas Cunningham and Jane Doe Cunningham, husband and wife, | |
| Defendants. | |

I. Background..................................................................................................... 1

II. Personal Jurisdiction.................................................................................... 5

III. Arbitration ................................................................................................... 6

  A. Defendants Sly and Brian Sly & Company.............................................. 8

    1. Trustee Standing.................................................................................. 8

    2. Post-Filing Buy-In to the Arbitration Clause .................................... 9

  B. Arbitration by Estoppel ......................................................................... 10

    1. *MS Dealer*, the Narrow Approach, and the Broad Approach ......... 10

    2. *MS Dealer* and the Ninth Circuit................................................... 12

    3. *Carlisle* and the Return to State Law ............................................ 12

    4. Federal Law Based On "Traditional Principles of State Law" ........ 14

      a. "Traditional Principles" of Equitable Estoppel............................. 14

      b. *MS Dealer*'s Broad Approach Compared to "Traditional Principles" ......... 16

      c. The Narrow Approach Compared to "Traditional Principles" .................... 17

      d. The Facts of this Case Compared to "Traditional Principles"..................... 17

    5. State Law .......................................................................................... 18

  C. Arbitration through Agency ................................................................... 19

    1. Arbitration and Agency Generally ................................................... 19

    2. Defendant Huff's Agency Relationship ........................................... 20

    3. Defendant Bean's Agency Relationship........................................... 21

  D. Unconscionability.................................................................................. 23

IV. Attorney Fees.............................................................................................. 23

V. Conclusion .................................................................................................. 24

Before the Court are (1) "Defendants Thomas Cunningham and Jane Doe Cunningham's Motion to Dismiss or Alternatively, Motion to Compel Arbitration and Stay Litigation" (Doc. 22) and (2) "Defendants Brian Nelson Sly, Brian Sly and Company, Inc., Brian Sly and Company, Wilbur Anthony Huff, and Thomas J. Bean's Motion to Compel Arbitration and Stay Litigation" (Doc. 23). The parties have since stipulated to dismiss Defendant Jane Doe Cunningham, thus resolving that part of the Cunninghams' motion (*see* Docs. 47–48). The motions to compel arbitration will be granted as to Defendant Bean, but denied as against the other Defendants. The motion to dismiss Thomas Cunningham for lack of personal jurisdiction will be denied.

## I.    BACKGROUND

Plaintiff Kingsley Capital Management is an Arizona limited liability company controlled by Dr. Bruce Kingsley, an Arizona resident. Plaintiff Bruce Paine Kingsley MD IRA Rollover is a trust for which Kingsley is the trustee. Kingsley himself is not a plaintiff, but at all times relevant to this action, Plaintiffs acted at Kingsley's direction. For purposes of this order, there is no need to distinguish between Plaintiffs' actions and Kingsley's actions. The Court's use of "Kingsley" below therefore refers to actions taken by Bruce Kingsley himself, as well as the actions he caused Plaintiffs to take.

According to Kingsley's complaint, he met Defendant Brian Sly in 1994. A friendship resulted. In 2005, Sly began pitching certain investments to Kingsley. One such investment involved an air filter company. Kingsley did not invest, and the air filter company apparently failed.

Sly followed up with another investment opportunity, this one involving workers' compensation insurance. This investment took the form of membership interests in certain limited liability companies. Sly did not personally own such membership interests, but had invested through two trusts for which he is trustee. Many of these LLCs changed their names during the course of relevant events, but most of them had a name related to the words *air* or *oxygen* — perhaps a holdover from the defunct air filter business. Distinguishing between the various LLCs is not important for purposes of this

order, and the Court will therefore generically refer to Sly's workers' compensation investment and the LLCs that effectuated it as "Oxygen."

Supposedly, Sly and other Oxygen investors (who, like Sly, invested indirectly through trusts or business arrangements) had acquired a workers' compensation carrier and hoped to expand its business. Expanding its business, however, required increased reserves. Sly therefore pitched to Kingsley the chance to invest in Oxygen. If Kingsley invested, Oxygen would add his investment to its insurance reserves, and Kingsley would receive investment returns based on insurance premiums collected. Sly told Kingsley that Sly's Oxygen investment had been earning 20% returns.

Kingsley did not invest in Oxygen immediately. He was wary of Sly's main business partner in the Oxygen investment, Defendant Wilbur Anthony Huff. Kingsley knew that Huff had once been convicted of mail fraud.[1] Sly explained that Huff had never really done anything wrong, but felt compelled to plead guilty in the face of prosecutorial threats that his father would also be charged in the same case. Kingsley nonetheless maintained his distance from Oxygen.

In January 2008, Sly invited Kingsley to attend an upcoming "investor reward trip" at the Phoenician Resort in Phoenix. This trip would bring Oxygen investors up-to-date on the progress of the investment and would also provide an opportunity for a more detailed pitch of the Oxygen investment to potential investors such as Kingsley.

Kingsley attended the investor reward trip at the Phoenician, which took place in March 2008. All of the Oxygen investors attended, as did one other potential investor whom the complaint does not name. As described by Kingsley, this investor meeting focused mostly on pitching Oxygen to the potential investors. Sly described Oxygen's structure and also introduced various other investors and principal actors. These included Huff, described as "the man who makes it happen"; Defendant Thomas J. Bean, supposedly "in charge of operations"; Defendant Charles J. Antonucci, Sr., "the President

---

[1] *United States v. Huff et al.*, No. 3:00-cr-123-H (W.D. Ky.).

- 2 -

of Park Avenue Bank of New York and [Oxygen's] banker"; and Defendant Thomas Cunningham, "the accountant." (Doc. 1-3 at ¶ 51.) Each of these Defendants presented a rosy picture of Oxygen's prospects. Cunningham, in particular — who was introduced by Sly as a CPA and part of the Oxygen management team — presented financial data and answered questions about Oxygen's financial status, all of which pointed to good financial health. He did not contradict anything that Sly said about him or Oxygen.

Kingsley began to warm up to Oxygen following the March 2008 investor meeting. He began communicating frequently with Sly and Huff about the details of a proposed investment. He still had concerns, but Huff eventually won him over by a deal involving a put option agreement that would permit a quick refund of his full investment, with a letter of credit issued by Antonucci's bank securing the put option agreement.

In July 2008, Kingsley invested $1.75 million in preferred units of Oxygen LLC membership. Kingsley therefore joined Oxygen and became subject to the arbitration clause in its operating agreement:

> In the event of any dispute, controversy or claim by, among or between Member(s) and/or the Company arising out of or relating to this Agreement and/or the Offering, including as to its interpretation or as to the arbitrability of any issue arising hereunder, such dispute shall be submitted to binding arbitration in Louisville, Kentucky . . . . The presentation of evidence shall be governed by the Federal Rules of Evidence. Discovery in all respects shall be controlled by the arbitrator/panel.

(Doc. 1-4 at 48.)[2] In this clause, "Offering" refers to Oxygen's "offering and sale of Preferred Units." (*Id*. at 51.) The Oxygen operating agreement also states that it will be governed by Kentucky law. (*Id*. at 49.)

---

[2] At the time Kingsley joined Oxygen, it was a member-managed company. In early 2010, Oxygen converted to a manager-managed company. The arbitration clause was then amended to cover disputes "among or between Member(s), the Manager and/or the Company arising out of or relating to this Agreement and/or the Offering." (Doc. 31-1 at 29.)

Not long after investing, Kingsley began to fear he would lose his investment. He learned, for instance, that Antonucci's bank was not well-capitalized and that Huff would allegedly invest $5 million to shore it up. Antonucci later left the bank, which failed, and Antonucci has since pleaded guilty to bank fraud.[3] The bank's failure doomed Kingsley's letter of credit.

Kingsley also could not obtain audited Oxygen financials. Kingsley learned that Cunningham did not have an active CPA license, did not consider himself part of Oxygen's management, and had not audited Oxygen's financials before the March 2008 investor meeting. Kingsley also learned that Bean, supposedly in charge of "operations," had no real control of Oxygen and instead spent most of his time managing a talk radio personality in Florida. Even more disturbingly, Kingsley learned of potential ongoing criminal activities by various persons associated with Oxygen.

Kingsley eventually exercised his put option agreement in May 2010, to no avail, and then filed this action on July 2010. Kingsley alleges various forms of securities fraud, consumer fraud, and common law fraud. He asserts no claim under the Oxygen operating agreement.

Cunningham has moved to dismiss for lack of personal jurisdiction. All Defendants have moved to compel arbitration under the Oxygen operating agreement's arbitration clause, claiming that Kingsley is equitably estopped from denying arbitration with them. Huff and Bean have also moved to compel arbitration as Oxygen's purported agents. Finally, Sly and Brian Sly & Company argue that they are now signatories to the Oxygen operating agreement because Sly caused his trusts each to transfer one Oxygen membership unit apiece to himself and Brian Sly & Company. This transfer took place in October 2010 — three months after Kingsley filed suit.

---

[3] *United States v. Antonucci*, No. 1:10-cr-00922-NRB (S.D.N.Y.).

**II.    PERSONAL JURISDICTION**

Cunningham, a resident of New Jersey, challenges this Court's personal jurisdiction over him.  When a defendant challenges personal jurisdiction, the plaintiff must make a prima facie showing of facts that, if true, would support personal jurisdiction.  *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128–29 (9th Cir. 2003).  Specifically, the plaintiff must show: (a) the defendant purposefully directed his activities toward or consummated some transaction within the forum, or otherwise performed some act by which he purposefully availed himself of the privilege of conducting activities in the forum; (b) the legal claims arise out of or relate to the defendant's forum-related activities; and (c) the exercise of jurisdiction is reasonable. *CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1111 (9th Cir. 2004).  In tort cases, the purposeful direction element can be satisfied by the "effects test" — showing that "the defendant (1) commit[ed] an intentional act; (2) expressly aimed at the foreign state; (3) causing harm in the foreign state that the defendant knew was likely to be suffered in that state." *Id*.

Kingsley has alleged enough for a prima facie case of jurisdiction over Cunningham.  Kingsley alleges that Sly introduced Cunningham at the March 2008 investor meeting as "the accountant" and "part of the management team." (*See* Doc. 1-3 ¶¶ 51, 65.)  Cunningham allegedly "did not object to" or "contradict anything said during Sly's presentation.  Specifically, Cunningham did not refute that he held a management role."  (*Id*. ¶ 66.)   Cunningham then "presented financial data and information and answered questions about the financial status of the Oxygen entities" without disclosing that he had performed "no actual 'accounting' of the Oxygen entities."  (*Id*. ¶ 68.)  Finally, Kingsley alleges that he "later learned that Cunningham did not hold a CPA license at the time of the March 2008 Investor Meeting or anytime thereafter, was not a practicing accountant, performed no actual accounting work for the Oxygen entities, and did not consider himself a member of the Oxygen entities' management."  (*Id*. ¶ 72.)

Without admitting any of these accusations, Cunningham says they fall short of activities purposefully directed at Arizona. He attended a single meeting at which Kingsley was an invited guest, and that meeting happened to be in Arizona. But Cunningham views the personal jurisdiction test too narrowly. Kingsley claims that the Oxygen investment was a scam perpetrated by various persons acting together, including Cunningham. Kingsley infers that the March 2008 investor meeting in Arizona was used, at least in part, to convince Kingsley to invest in a scam. Kingsley reasonably draws this inference, considering his guest status at the March 2008 meeting, the investors' familiarity with each other, their alleged misrepresentations, and their failure to correct each other's misrepresentations. Kingsley has therefore stated a prima facie case for personal jurisdiction over Cunningham as an alleged participant in a scam intentionally aimed at least partly at Kingsley in Arizona, with the injury eventually being felt in Arizona.

Cunningham asks this Court to move beyond the prima facie stage to an evidentiary hearing. "If a plaintiff make[s] [a prima facie jurisdictional] showing . . . it does not necessarily mean that he may then go to trial on the merits. . . . [T]he district court has the discretion to take evidence at a preliminary hearing in order to resolve the contested issues." *Data Disc, Inc. v. Sys. Tech. Assocs.*, *Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). However, such a hearing runs the "risk of prejudicing [the plaintiff's] case on the merits," *id*. at n.10, because facts of jurisdiction overlap with facts of liability. Accordingly, Cunningham's personal jurisdiction motion will be denied.

## III.    ARBITRATION

The Federal Arbitration Act provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement,

> providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. Under the Act, "a district court must issue an order compelling arbitration if the following two-pronged test is satisfied: (1) a valid agreement to arbitrate exists; and (2) that agreement encompasses the dispute at issue." *United Computer Sys. v. AT&T Info. Sys.*, 298 F.3d 756, 766 (9th Cir. 2002).

As to the first question, Kingsley does not challenge the validity of the Oxygen operating agreement's arbitration clause. Thus, a valid agreement to arbitrate exists. As to the second question, the arbitration clause at issue requires arbitration of "any dispute, controversy or claim by, among or between Member(s), the Manager and/or the Company arising out of or relating to this Agreement and/or the Offering." Under this language, Kingsley's allegations — without considering against whom they run — fall within the scope of the arbitration clause because they arise from the "Offering," or in other words, his decision to buy Oxygen "preferred units." In this sense, the "agreement encompasses the dispute at issue." *United Computer Sys.*, 298 F.3d at 766 (emphasis added).

However, the "dispute at issue" must be a "dispute between the parties [to the contract containing the arbitration clause]." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999). The arbitration clause here covers only disputes "among or between Member(s), the Manager and/or the Company." No Defendant is a member of Oxygen, with the possible exception of Sly (discussed further below), and thus no Defendant has an explicit right to demand arbitration. Nonetheless, those who have not signed a contract containing an arbitration clause may sometimes benefit from it through doctrines such as assumption, agency, veil-piercing/alter ego, and estoppel. *See Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009). Here, Defendants variously assert a right to compel arbitration through agency and estoppel.

As explained below, Sly does not get the benefit of Oxygen's arbitration clause through his recent purchase of Oxygen membership interests, nor is Kingsley estopped

- 7 -

from refusing arbitration. Defendant Bean, however, can compel arbitration through an agency theory.

### A. Defendants Sly and Brian Sly & Company[4]

#### 1. Trustee Standing

When Kingsley filed this action, Sly was not personally an Oxygen member. Rather, certain trusts for which he is "sole owner, grantor, trustee and beneficiary" (Doc. 23-1 ¶ 3) held the membership interests. Sly asserts that he should nonetheless be considered an Oxygen member because "[t]he interests of the Trusts and Mr. Sly are completely congruent. None of the Trusts['] interests diverge in any manner from Mr. Sly's interests." (Doc. 33 at 2.)

Sly falls short of showing that he is an Oxygen member because his trusts are members, especially considering that his argument implies he had no trusts in the first place. *See*, *e.g.*, *Restatement (Third) of Trusts* § 69 (2003) ("If the legal title to the trust property and the entire beneficial interest become united in one person, the trust terminates."); *Restatement (Second) of Trusts* § 99 cmt. e (1959) (if "there is no separation of the legal and beneficial interests" then no trust exists because "there are no duties running from [the alleged trustee] to himself, and no rights against himself"); *id*. § 341(1) ("if the legal title to the trust property and the entire beneficial interest become united in one person who is not under an incapacity, the trust terminates"). Further, Sly has not cited any case law even remotely addressing whether a trustee in his personal capacity is considered a member of a limited liability company in which the trust has invested, for arbitration or any other purposes. Accordingly, Sly does not make his case and cannot compel arbitration on this basis.

---

[4] The complaint names another Sly-related Defendant, Brian Sly & Company, Inc. Sly represents that, for purposes of this motion, there is no difference between Brian Sly & Company and Brian Sly & Company, Inc. (Doc. 23 at 5 n.3, 6 n.4.) The Court intends "Brian Sly & Company" to refer to both "& Company" Defendants.

## 2.        Post-Filing Buy-In to the Arbitration Clause

Sly also asserts that he and his eponymous company became Oxygen members after Kingsley filed suit by causing Sly's trusts to transfer one unit of Oxygen membership to each of them.  Kingsley hotly contests whether the transfer of membership interests was procedurally proper or permissible at all.  That issue itself may be subject to arbitration, and in any event, it cannot be decided without an evidentiary hearing.  But it need not be decided to rule on the pending motions.

No party has cited, and this Court did not locate, any authority on whether a party can buy into an arbitration agreement after being taken to court.  However, a recent Second Circuit case suggests a reasonable approach.  In *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354 (2d Cir. 2008), plaintiff Sokol contracted with an individual named Tolmakov to buy a large share of his stake in an oil company, Emir Oil.  Sokol's contract with Tolmakov contained an arbitration clause.  Defendants, not parties to that contract, convinced Tolmakov to sell his Emir Oil interest to them instead, and Emir Oil thereby became Defendants' wholly owned subsidiary.  Sokol sued Defendants for tortious interference with contract, among other things.  Defendants argued that they had such a close relationship with Tolmakov and the Emir Oil transaction that they deserved the benefit of the arbitration clause between Sokol and Tolmakov.  *Id*. at 356–57, 362.  The Second Circuit disagreed, stating that a party could not tortiously interfere with a contract and then stand on that contract's arbitration clause.  *Id*. at 362.

Sly's new relationship to the Oxygen operating agreement differs from the *Sokol* defendants' relationship to the contract at issue there, but the principle underlying *Sokol* applies equally well: the law should not expand arbitration through the bad faith conduct of the party seeking to compel arbitration.  Sly's transfer of a single Oxygen membership interest from each trust to him personally and to his company is bad faith conduct obviously intended to buy into the arbitration clause.  Such conduct undermines the Federal Arbitration Act, which makes arbitration mandatory only by mutual express

written consent or an equivalent.  *See Mundi*, 555 F.3d at 1045.  Sly's theory, by contrast, leaves him free to claim arbitration or avoid it, as he wishes.  If a dispute arises between Sly and Kingsley regarding Oxygen, Sly may wait until Kingsley actually files suit, then evaluate the claims, the forum, the assigned judge, and so forth, and decide if he would prefer litigation or arbitration.  If he prefers arbitration, he causes his trusts to transfer Oxygen membership interests to him; if he prefers litigation, he does nothing. Conversely, if Kingsley demands arbitration against Sly, Sly could voluntarily submit, or he could argue against it because he did not sign the Oxygen operating agreement. However it plays out, Kingsley is at Sly's whim whether the case must go to arbitration.

Kingsley consented to arbitrate in some circumstances, but he did not consent to arbitrate at the election of others.  Such one-sided control falls short of the mutual commitment to arbitration necessary for its enforceability.  *Cf. Morrison v. Amway Corp.*, 517 F.3d 248 (5th Cir. 2008) (arbitration agreement unenforceable because one party reserved the unilateral right to amend or terminate contract); *In re C & H News Co.*, 133 S.W.3d 642, 647 (Tex. Ct. App. 2003) (arbitration agreement unenforceable because one party could pick and choose which disputes to arbitrate).  There are no puts and calls in binding arbitration.  Accordingly, Sly's acquisition of Oxygen membership interests after Kingsley filed suit does not give Sly grounds to force Kingsley to arbitrate.

## B.     Arbitration by Estoppel

### 1.     *MS Dealer*, the Narrow Approach, and the Broad Approach

None of the other Defendants claims Oxygen membership.   But all of the remaining Defendants (Sly and his companies, Huff, Bean, and Cunningham) argue that Kingsley should be equitably estopped from avoiding arbitration with them.  Defendants rely on federal case law from the last few decades that permits non-signatories to an arbitration agreement to equitably estop a signatory from refusing to arbitrate with them. *See* Christopher Driskill, Note, *A Dangerous Doctrine: The Case Against Using Concerted-Misconduct Estoppel to Compel Arbitration*, 60 Ala. L. Rev. 443, 447–64 (2009) (describing the development of arbitration-by-estoppel).  A leading synthesis of

modern arbitration-by-estoppel jurisprudence appears in *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942 (11th Cir. 1999), which articulates two tests for determining when equitable estoppel applies:

> Existing case law demonstrates that equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances. First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. Second, application of equitable estoppel is warranted when the signatory to the contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise, the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted.

*Id.* at 947 (internal quotation marks and citations omitted; alterations incorporated). Other circuits have adopted one or both of these tests. *See*, *e.g.*, *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 395–96 (4th Cir. 2005); *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005); *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000).

*MS Dealer*'s two tests — "each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement" and "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories" — are sometimes referred to as the "narrow approach" and the "broad approach," respectively. *See* Driskill, 60 Ala. L. Rev. at 460–64. As applied, the narrow approach will compel arbitration only when the plaintiff's claims "rely on the terms of the written agreement [containing the arbitration clause] in asserting its claims against the nonsignatory." *Hawkins v. KPMG LLP*, 423 F. Supp. 2d 1038, 1050 (N.D. Cal. 2006) (internal quotation marks omitted). The broad approach, by contrast, has been interpreted to sweep in nearly every party and claim that has some connection to the

transaction which resulted in the contract with an arbitration clause. It therefore "avoid[s] duplicative litigation which undermines the efficiency of arbitration," *id.*, but as a Massachusetts Superior Court judge astutely observed, it is "more about judicial efficiency than equity, even though it invokes equity as its justification," *Vassalluzzo v. Ernst & Young LLP*, No. 06-4215-BLS2, 2007 WL 2076471, at *4 (Mass. Super. Ct. June 21, 2007).

### 2.   *MS Dealer* **and the Ninth Circuit**

The Ninth Circuit has not expressly adopted either *MS Dealer* test. *See Jones v. Deutsche Bank AG*, No. C 04-05357 JW, 2007 WL 1456041 (N.D. Cal. May 17, 2007) (granting a stay while the parties appealed to the Ninth Circuit to determine the scope of equitable estoppel in this Circuit; this case was settled on appeal without decision). However, in *Mundi v. Union Security Life Insurance Co.*, our Circuit took a narrow approach that would not require arbitration in this case. That narrow approach turns on who sued first. Did the non-signatory sue first to compel arbitration, or did the signatory forego arbitration and sue first on the merits? *See Mundi*, 555 F.3d at 1046.

The *Mundi* case fell in the second category, as does this case. As to such signatory-sues-first cases, the Ninth Circuit noted that its precedent had never before permitted a non-signatory to compel arbitration, and "in light of the general principle that only those who have agreed to arbitrate are obliged to do so, we see no basis for extending the concept of equitable estoppel of third parties in an arbitration context beyond the very narrow confines delineated in [certain previous cases]." *Id*. Therefore, under *Mundi*, Kingsley is not estopped from maintaining this action.

### 3.   *Carlisle* **and the Return to State Law**

A 2009 Supreme Court decision, however, indicates that arbitration-by-estoppel should no longer be decided under the federal case law, but rather under state law. In *Arthur Andersen LLP v. Carlisle*, 556 U.S. __, __, 129 S. Ct. 1896 (2009), the Supreme Court held that a non-signatory can immediately appeal a denial of a motion to compel

arbitration against a signatory.  In the process, the Court explained that nothing in the

Federal Arbitration Act —

> purports to alter background principles of state contract law
> regarding the scope of agreements (including the question of
> who is bound by them).   Indeed § 2 explicitly retains an
> external body of law governing revocation (such grounds "as
> exist at law or in equity").   And we think § 3 adds no
> substantive restriction to § 2's enforceability mandate.  State
> law, therefore, is applicable to determine which contracts are
> binding under § 2 and enforceable under § 3 if that law arose
> to govern issues concerning the validity, revocability, and
> enforceability of contracts generally.   Because traditional
> principles of state law allow a contract to be enforced by or
> against nonparties to the contract through assumption,
> piercing the corporate veil, alter ego, incorporation by
> reference, third-party beneficiary theories, waiver and
> estoppel, the Sixth Circuit's holding that nonparties to a
> contract are categorically barred from § 3 relief was error.

*Id.* at 1902 (emphasis added; internal quotation marks, citations, and footnotes omitted;

alterations incorporated).

Recently, the Eleventh Circuit — author of the seminal *MS Dealer* decision —

interpreted *Carlisle* as "clarify[ing] that state law governs [the arbitration-by-estoppel]

question, and to the extent any of our earlier decisions indicate to the contrary [citing *MS

Dealer*, among others], those indications are overruled or at least undermined to the point

of abrogation." *Lawson v. Life of the South Ins. Co.*, 648 F.3d 1166, ___, 2011 WL

3476876, at *4 (11th Cir. Aug. 10, 2011); *see also Maeda Pac. Corp. v. GMP Hawaii,

Inc.*, No. 08-00012, 2011 WL 3476609, at *10 (D. Guam Aug. 2, 2011) (interpreting

*Carlisle* as requiring local law); *Lowrey v. Tritan Group Ltd.*, No. 3:08-cv-00779, 2009

WL 2136159, at *2 (M.D. Tenn. July 14, 2009) (same).[5]  According to these authorities,

*Carlisle* effected an *Erie*-like abrogation of federal law in favor of state law.[6]

---

[5] A line of district court cases quote *Carlisle*'s nod to state law, but then go on to
apply only federal authority in their analyses — including cases such as *MS Dealer* — as
if *Carlisle* changed nothing.  *Hornicek v. Cardworks Servicing, LLC*, No. 10-3631, 2011
WL 2623274, at *2 (E.D. Pa. June 29, 2011); *Ashland Jewelers, Inc. v. NTR Metals, LLC*,
No. 10 C 4690, 2011 WL 1303214, at *2 (N.D. Ill. Mar. 31, 2011); *Global Client
Solutions, LLC v. Fluid Trade, Inc.*, No. 10-CV-0123-CVE-TLW, 2010 WL 2690373, at
*8 (N.D. Okla. July 1, 2010).  None of these cases acknowledges the difference between

But this may not be the only interpretation of *Carlisle*. *Carlisle* invoked "traditional principles of state law" but its subsequent analysis did not cite the law of any particular state. Thus, one might read *Carlisle* as affirming the federal nature of the estoppel question, but only to the extent that the federal law tracks "traditional principles of state law" that "arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."

This Court need not decide whether the source of law for resolving arbitration-by-estoppel is federal law based on "traditional principles of state law" or the law of the state governing the contract. In this case, both paths lead to the same place, namely, Kingsley is not estopped to refuse arbitration.

### 4. Federal Law Based On "Traditional Principles of State Law"

If *Carlisle* requires rules that comport with "traditional principles" of state estoppel law — even if deemed to be a species of federal law — then much of federal case law regarding arbitration-by-estoppel is no longer valid. Further, "traditional principles" of equitable estoppel would not compel Kingsley to arbitrate.

#### a. "Traditional Principles" of Equitable Estoppel

Estoppel is generally defined as "[a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before." *Black's Law Dictionary* 629 (9th ed. 2009). Equitable estoppel is, "[i]n its broadest sense," essentially the same as

---

federal arbitration-by-estoppel authority and "traditional principles" of state estoppel law.

[6] *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) (abrogating "federal general common law"). But *Carlisle*'s emphasis on state law is not really a change of course. In 1995, the Supreme Court declared, "When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). However, *Carlisle* appears to be the first case to bring arbitration-by-estoppel arguments explicitly within the category of disputes over "whether the parties agreed to arbitrate a certain matter." *Cf. Grigson*, 210 F.3d at 531–40 (Dennis, J., dissenting) (opposing the majority's choice to follow federally created arbitration-by-estoppel precedent; relying in part on *First Options*' state-law emphasis).

- 14 -

estoppel generally: "a means of preventing a party from asserting a legal claim or defense which is contrary [to] or inconsistent with his prior action or conduct." 28 Am. Jur. 2d *Estoppel and Waiver* § 27 (2011) (hereafter, "Am. Jur. *Estoppel*"). In other words, "it is generally held that a representation of past or existing fact made to a party who relies upon it reasonably may not thereafter be denied by the party making the representation if permitting the denial would result in injury or damage to the party who so relies." 4 Richard A. Lord, *Williston on Contracts* § 8:3 (4th ed. 2001) (hereafter, "*Williston*").

A more definite statement of equitable estoppel's elements is difficult because the claim "rests upon the facts and circumstances of the particular case in which it is urged[.] . . . [C]onsequently, any attempted [statement of elements] usually amounts to no more than a declaration of an estoppel under those facts and circumstances." Am. Jur. *Estoppel* § 27. One common element, however, is that the statement or conduct at issue must have been made with the intent that the other party rely on it. *Id.* § 39. Thus, equitable estoppel is often linked to "the prevention of actual or constructive fraud." *Id.* § 28; *see also Black's Law Dictionary* 630 (9th ed. 2009) ("This doctrine is founded on principles of fraud.").

In contract law specifically, equitable estoppel generally arises to "preclude[] one who accepts the benefits from repudiating the accompanying or resulting obligation. Parties cannot accept benefits under a contract fairly made and at the same time question its validity." Am. Jur. *Estoppel* § 60 (footnote omitted). Thus, for example,

> [e]quitable estoppel bars assertion of the statute [of frauds] as a defense where the party setting up the statute as a defense has misrepresented some fact bearing upon the statute's satisfaction, thereby inducing the plaintiff's detrimental reliance. The fact misrepresented may be that the statute is inapplicable or already satisfied . . . .

4 *Corbin on Contracts* § 12.8, at 36 (rev. ed. 1993); *see also* 4 *Williston* § 27:16 (discussing a similar scenario).

### b. *MS Dealer*'s Broad Approach Compared to "Traditional Principles"

*MS Dealer*'s "broad approach" — "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories" — goes far beyond "traditional principles of state law" regarding equitable estoppel. Indeed, it expands equitable estoppel beyond recognition, transforming the contract's arbitration clause into a gravitational force, capable of pulling in anything that gets too close. And instead of focusing on the signatory-plaintiff's alleged inequitable conduct, it focuses on the defendants' alleged misconduct.

Turning the focus from the signatory's actions to the non-signatories' actions already turns equitable estoppel on its head. The explanation for it goes even further. Supposedly, if a non-signatory cannot compel a signatory to arbitrate where the signatory has alleged "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories," then "the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." *MS Dealer*, 177 F.3d at 947. This explanation has two problems. First, *Carlisle* located the power to compel arbitration through equitable estoppel in "traditional principles of state law." Thus, the "federal policy in favor of arbitration" has little force. Second, it does not explain how "the arbitration proceedings between the two signatories would be rendered meaningless." Most courts elaborating on this claim link it to the efficiency of litigating all claims in one (arbitral) forum, and sometimes related concepts such as the possibility of inconsistent judgments if a court resolves claims against certain parties and an arbitrator resolves related claims against other parties. *See Hawkins*, 423 F. Supp. 2d at 1050; *Carroll v. Leboeuf, Lamb, Greene & MacRae, L.L.P.*, 374 F. Supp. 2d 375, 378 (S.D.N.Y. 2005); *Vassalluzzo*, 2007 WL 2076471, at *4. But judicial efficiency is not part of the traditional equitable estoppel analysis. Accordingly, *MS Dealer*'s broad approach conflicts with traditional

- 16 -

state-law estoppel principles and therefore must be rejected if *Carlisle* endorses federal arbitration-by-estoppel law only to the extent it is based in traditional state law.

### c. The Narrow Approach Compared to "Traditional Principles"

The narrow approach to arbitration-by-estoppel comes much closer to traditional equitable estoppel. The narrow approach typically arises where: (1) the *signatory* seeks to compel arbitration with a non-signatory that has "knowingly exploit[ed] the agreement containing the arbitration clause despite having never signed the agreement," *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (internal quotation marks omitted); and (2) the *non-signatory* seeks to compel arbitration with a signatory that "seek[s] to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision," *Grigson*, 210 F.3d at 528. This articulation, though not a perfect overlap, closely approaches the paradigm for contract-based equitable estoppel: "preclud[ing] one who accepts the benefits from repudiating the accompanying or resulting obligation." Am. Jur. *Estoppel* § 65. The narrow approach to equitable estoppel thus remains largely valid under traditional state-law estoppel principles.

### d. The Facts of this Case Compared to "Traditional Principles"

Defendants' argument for arbitration resembles the narrow approach. They claim that but for entering into the Oxygen investment and signing the Oxygen's operating agreement, Kingsley would have no claims against any of them. Thus, Defendants argue, Kingsley is seeking to "hold the non-signator[ies] liable pursuant to duties imposed by the [Oxygen operating agreement]." *Grigson*, 210 F.3d at 528.

Defendants' "but for" premise is insufficient. This lawsuit does not affirm the operating agreement or seek any benefit under it. The mere fact that Kingsley entered into the operating agreement does not mean that Kingsley is attempting to hold Defendants liable for duties imposed by it. Kingsley's claims against Defendants arise from their allegedly tortious conduct, not from the operating agreement. In essence, Kingsley claims that Defendants fraudulently induced him into the operating agreement

- 17 -

— which would not be enough to get Kingsley out of arbitration *with the signatories*. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967). But Defendants *did not sign*. Nor does the record disclose any action by Kingsley that would lead Defendants to believe that he would treat them as signatories. To allow non-signatories to force a signatory into arbitration merely because of that signature would reduce equitable estoppel again to a fiction, and one of nearly universal reach. No basis exists, then, to estop Kingsley under "traditional principles" of state estoppel law.

### 5. State Law

As discussed above, *Carlisle* does not state clearly whether "traditional principles of state law" refers to federal law incorporating "traditional principles of state law" or to the law of the state governing the contract. The previous subsection discussed the outcome under federal law that incorporates traditional state-law principles. But if *Carlisle* requires courts to apply the law of the state governing the contract (Kentucky), the result is the same. Kentucky law treats equitable estoppel even more restrictively than "traditional principles of state law," and Kingsley is therefore not estopped.

"'The doctrine of equitable estoppel is applied to transactions in which it would be unconscionable to permit a person to maintain a position which is inconsistent with one in which he has acquiesced.'" *Bruestle v. S & M Motors, Inc.*, 914 S.W.2d 353, 355 (Ky. Ct. App. 1996) (quoting *Hicks v. Combs*, 223 S.W.2d 379, 381 (Ky. 1949)). The claim comprises six elements: (1) the estopped party engaged in conduct which amounts to false representation or concealment of the facts, or, at the least, which was calculated to convey an impression that the facts were otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the estopped party intended, or at least expected, that such conduct would be acted upon by the party now asserting estoppel; (3) the estopped party knew, actually or constructively, of the real facts; (4) the party asserting estoppel lacked knowledge of the truth as to the real facts; (5) the party asserting estoppel relied upon the conduct of the party to be estopped; and (6) the party

asserting estoppel acted based thereon in such a way as to change its position prejudicially. *Weinberg v. Gharai*, 338 S.W.3d 307, 314 (Ky. Ct. App. 2011).

None of these elements is satisfied. Of central importance, Kingsley has not led Defendants to believe they would have the benefits of the Oxygen operating agreement. Therefore, no basis exists under Kentucky law to equitably estop Kingsley from maintaining this action.

### C. Arbitration through Agency

Defendants Bean and Huff both contend that they are agents of Oxygen and therefore deserve to compel arbitration as such. As explained below, Huff's legal inability to be an agent for Oxygen precludes him from claiming the benefits of agency. Bean, however, was an agent of Oxygen and therefore may compel arbitration.

### 1. Arbitration and Agency Generally

Agency and arbitrability cross paths in two situations: (i) where a principal facing an arbitration demand disavows an arbitration clause signed by its agent; or (ii) where an agent charged with arbitration seeks to shift that burden to its principal. *See* 1 Larry E. Edmonson, *Domke on Commercial Arbitration* § 13:2 (3d ed. 2011). In these typical cases, either the principal or the agent wants to avoid arbitration. Defendants Bean and Huff, however, want the opposite. They see arbitration as a refuge.

Case law regarding Bean's and Huff's situation is thin, perhaps because *MS Dealer*-inspired arbitration-by-estoppel authority is broad enough to cover most any situation in which agency might also play a role. *See, e.g.*, *Kulpa v. OM Fin. Life Ins. Co.*, 558 F. Supp. 2d 676 (S.D. Miss. 2008); *Bannett v. Hankin*, 331 F. Supp. 2d 354 (E.D. Pa. 2004); *Dr. Pepper Bottling Co. of Tex., Inc. v. Presidential Life Ins. Co.*, No. CA 3:01-CV-2168-R, 2002 WL 628658 (N.D. Tex. Apr. 16, 2002); *Spurlock v. Life Ins. Co. of Va.*, No. CIV.A.98-D-222-N, 2000 WL 1785300 (M.D. Ala. Oct. 31, 2000). But with the demise of that body of case law, a separate analysis of agency is necessary.

One area where Bean's and Huff's argument sometimes arises is the broker-dealer's relationship to investment clients. In these cases, an individual typically agrees

to let a financial firm manage his or her investments, and the agreement between the client and the firm contains an arbitration clause. The client later sues the employees at the firm who made investment decisions. In these cases, the firm's employees may invoke the arbitration clause on an agency theory because the firm can only carry out its executory investment advisory functions through such employees. *See*, *e.g.*, *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1121 (3d Cir. 1993); *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281–82 (6th Cir.1990); *Letizia v. Prudential Bache Sec.*, 802 F.2d 1185, 1187–88 (9th Cir.1986). These cases have not strayed from "traditional principles of state law" regarding agency and therefore appear to remain good law after *Carlisle*.

### 2. Defendant Huff's Agency Relationship

Defendant Huff argues that the complaint's own words show he acted as an agent for Oxygen in soliciting Kingsley's investment in "the Offering." If true, this situation somewhat resembles the broker-dealer cases. However, Huff's argument is complicated by his status as a convicted felon. As Kingsley points out (and Huff does not dispute), Huff pleaded guilty to mail fraud — a crime involving dishonesty — and under federal law, it is also a crime if "[a]ny individual who has been convicted of any criminal felony involving dishonesty . . . willfully engages in the business of insurance . . . or participates in such business." 18 U.S.C. § 1033(e)(1)(A). Oxygen was in the business of insurance, so Huff was not legally permitted to act as Oxygen's agent.

No located authority (Kentucky or otherwise) addresses whether one can claim an agency relationship — for purposes of receiving the protections afforded to the principal (here, the arbitration clause) — when one cannot legally be an agent. The *Restatement (Second) of Agency* comes close when it declares, "The appointment of an agent to do an act is illegal if an agreement to do such an act or the doing of the act itself would be criminal, tortious, or otherwise opposed to public policy." *Restatement (Second) of Agency* § 19 (1958). However, the *Restatement (Third) of Agency* superseded its

predecessor in 2006, and it contains no directly analogous provision. Rather, at one point the commentary states:

> Capacity is not identical to legality, in that a person may have power to bind another although in exercising the power the person acts illegally. For example, a securities broker whose license has lapsed who buys securities on behalf of a customer affects the customer's legal position by making the customer the owner of the securities.

*Restatement (Third) of Agency* § 3.05 cmt. b (2006). But this comment is directed at whether a third party can claim that one principal (in this example, the customer) is bound by the agent's (broker's) action. This has nothing to do with whether the agent can claim protections available to him only as an agent for the other principal, the employer.

Since 2006, Kentucky courts have cited both the Second and Third Restatements, but it appears that no Kentucky court has ever cited either of the sections just discussed. Falling back on "traditional principles of state law," then, a longstanding tradition throughout American common law disciplines is good faith. One who cannot legally be an agent, and knows it, cannot act in good faith. As a matter of law, such a person cannot claim any benefit of agent status. Accordingly, Huff cannot compel Kingsley to arbitrate.

### 3. Defendant Bean's Agency Relationship

Defendant Bean does not rely on the broker-dealer case law, but solely on Kentucky law governing limited liability companies. Specifically, at all times relevant to this lawsuit, Bean claims — and Kingsley does not dispute — that he managed an LLC known as River Falls Financial Services, and River Falls, in turn, was Oxygen's "administrative member." Kentucky LLC law states that all members of a member-managed LLC are "agent[s] of the limited liability company for the purpose of its business or affairs." Ky. Rev. Stat. § 275.135(1). When Oxygen converted to a manager-managed LLC, River Falls became that manager and therefore retained its position as an agent of Oxygen. *Id.* § 275.135(2)(b) ("[e]very manager shall be an agent of the limited liability company for the purpose of its business or affairs"). In either case,

- 21 -

Bean argues that he acted as a subagent for Oxygen, through its formal agent, River Falls. *See Restatement (Third) of Agency* § 3.15(1) & cmt. b (2006) (discussing agency and subagency relationships created when an agent is itself a business entity that can only act through other agents).

Bean further points to the Oxygen arbitration clause, which specifically requires arbitration "of any dispute, controversy or claim by, among or between Member(s), the Manager and/or the Company arising out of or relating to this Agreement and/or the Offering." Bean argues he is at least Oxygen's manager, if not a stand-in for "the Company" itself. He therefore requests an order compelling arbitration on an agency theory.

Kingsley counters that Bean had no authority to act for Oxygen, despite Bean's and others' representations about Bean's management role. Kingsley claims that he would not have invested had he known that Bean had no control of Oxygen. (Doc. 1-3 ¶¶ 60–64.) In other words, Kingsley claims that the fraud supposedly perpetrated on him comprised, in part, the false representations regarding Bean's agency relationship with Oxygen.

It appears that no authority addresses whether arbitration should be compelled through an agency theory in these circumstances. Nonetheless, Kentucky law considers Bean an agent of Oxygen "for the purpose of its business or affairs." Ky. Rev. Stat. § 275.135(1), (2)(b). It is evident that Bean's representations to Kingsley regarding "the Offering" were made in the furtherance of Oxygen's "business or affairs." Accordingly, Bean may compel Kingsley to arbitrate the claims Kingsley currently asserts against Bean.[7]

---

[7] The Court makes this determination based on its understanding of the undisputed portions of the record before it, including Kingsley's surreply (Doc. 39). If Kingsley believes that the record nonetheless contains gaps that would affect this analysis, he may file a focused motion for reconsideration. If such a motion has merit, a hearing may be necessary under 9 U.S.C. § 4.

### D. Unconscionability

Kingsley argues, with very little elaboration, that arbitrating in Kentucky will be more expensive and therefore the arbitration agreement is substantively unconscionable. This issue is controlled by *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79 (2000), which held that vague and conclusory assertions of burdensome expense create only a "speculative" risk that the costs of arbitration would prevent plaintiffs from vindicating their rights, *id*. at 90–92. Kingsley's assertions here are vague and conclusory and therefore do not support invalidating the arbitration clause.

Kingsley also argues that the arbitration provision is unconscionable because it would force Kentucky law upon him and defeat the protections of the Arizona Securities Act, such as the Act's prohibition of fee-shifting in favor of defendants. This is really an argument of illegality rather than unconscionability, but in any event, it is not clear that the Oxygen operating agreement's reference to Kentucky law is intended to preclude Kingsley's securities fraud claims. If so, the operating agreement is invalid to that limited extent. Kingsley cannot be forced to give up his Arizona Securities Act claims, regardless of any choice-of-law or other stipulation. A.R.S. § 44-2000.

However, the Arizona Securities Act does not prohibit arbitration of claims brought under its provisions. And Defendants have conceded that fee-shifting under the Securities Act, if available at all, can only be in favor of Kingsley, despite arbitration rules that might allow otherwise. (*See* Doc. 33 at 11.)

## IV. ATTORNEY FEES

Defendant Bean asks for attorney fees, claiming that enforcing an arbitration clause makes him a successful party in a "contested action arising out of a contract." A.R.S. § 12-341.01. Some authority exists to support awarding attorney fees to parties that successfully compel arbitration. *See Canon Sch. Dist. No. 50 v. W.E.S. Constr. Co., Inc.*, 177 Ariz. 526, 530, 869 P.2d 500, 504 (1994). But no attorney fees will be awarded here for two reasons. First, the Oxygen operating agreement is governed by Kentucky law. Arizona's attorney fees statute therefore may not apply. Second, under the Arizona

statute, this Court has "discretion . . . to determine the circumstances appropriate for the award of fees." *Assoc. Indem. Corp. v. Warner*, 143 Ariz. 567, 570, 694 P.2d 1181, 1184 (1985).  Factors to consider include "[t]he merits of the claim or defense presented by the unsuccessful party," "the novelty of the legal question presented, and whether such claim or defense had previously been adjudicated in this jurisdiction."  *Id*.  Considering these factors, in the Court's discretion, attorney fees would be denied in any event.

**V.    CONCLUSION**

The practical problem in this case, as in so many with arbitration agreements, is to conclude these disputes without avoidable expense, especially without duplication, and with fidelity to the Federal Arbitration Act.  But fidelity to the Act trumps efficiency.  Binding arbitration requires "a written agreement for arbitration," 9 U.S.C. § 4, which plainly encompasses both the written agreement itself and those who bind themselves to it by signature or an equivalent.  The legitimacy of binding arbitration lies in consent, not in superior wisdom or policy of the federal courts.

Parties to an arbitration agreement are entitled to the fair meaning of the text they endorse.  But in many cases the arbitration clause — almost always a term of adhesion in a contract of adhesion — is written by one side summarily and without the clarity so easily available.  Kingsley alleges an investment fraud with actors different from the signatories.  Indeed, none of the signatories are defendants in this action, and there may be no reason of economic substance to have sued them.  The actors who were masters of the documents could have drafted an arbitration clause that gave fair notice that promoters and others in the roles of Defendants would come within the arbitration.  The investors could have then queried why such persons were not also signing, at least as to the arbitration obligation, thus making it mutual.  In future transactions such clarity can be supplied through the drafting itself.  It is not necessary for the courts to untether arbitration from the statute to have efficiency.  Persons who want arbitration can have both efficiency and predictability in arbitration by saying clearly what they want others to sign off on.

In the meantime this case will have duplicative proceedings. That duplication will be modest. This Court processes its cases in as little or less time than most arbitrations. The Court will manage discovery in this case with economy and expedition. It will have an eye to parallel efficiency with the arbitration.

IT IS THEREFORE ORDERED that "Defendants Brian Nelson Sly, Brian Sly and Company, Inc., Brian Sly and Company, Wilber Anthony Huff, and Thomas J. Bean's Motion to Compel Arbitration and Stay Litigation" (Doc. 23) is DENIED, except it is GRANTED as to Defendant Bean.

IT IS FURTHER ORDERED that "Defendants Thomas Cunningham and Jane Doe Cunningham's Motion to Dismiss or Alternatively, Motion to Compel Arbitration and Stay Litigation" (Doc. 22) is DENIED.

Dated this 30th day of September, 2011.

_____
Neil V. Wake
United States District Judge