**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kingsley Capital Management, LLC, et al., | No. CV-10-02243-PHX-NVW |
| Plaintiffs, | |
| vs. | **ORDER** |
| Brian Nelson Sly, et al., | |
| Defendants. | |

Before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 369), Defendants' Motion for Summary Judgment or Alternatively for Partial Summary Judgment (Doc. 371), the Responses, and the Replies. For the following reasons, Plaintiffs' Motion will be denied and Defendants' Motion will be granted in part.

I.    **Background**

Plaintiff Kingsley Capital Management is an Arizona limited liability company controlled by Dr. Bruce Kingsley, an Arizona resident. Plaintiff Bruce Paine Kingsley MD IRA Rollover is a trust for which Kingsley is the trustee. Kingsley himself is not a plaintiff, but at all times relevant to this action, Plaintiffs acted at Kingsley's direction. For the purposes of this order, there is no need to distinguish between Plaintiffs' actions and Kingsley's actions. The Court's use of "Kingsley" below therefore refers to actions taken by Bruce Kingsley himself, as well as the actions he caused Plaintiffs to take. Similarly, Defendants Brian Sly and Company and Brian Sly and Company, Inc. are entities controlled by Defendant Brian Sly. The Court therefore uses "Sly" below to refer

to actions taken by Brian Sly himself, as well as the actions he caused the other Defendants to take.

Kingsley and Sly were friends long before the events that led to this lawsuit.    In large part because of that friendship, Sly began pitching certain investments to Kingsley in 2005.  One such investment involved an air filter company.  Kingsley did not invest, and the air filter company apparently failed.

In early 2008, Sly and Kingsley began to have conversations about another investment opportunity, this one involving professional employer organizations (PEOs) and staffing businesses.  This investment took the form of membership interests in certain limited liability companies.  Many of these LLCs changed their names during the course of relevant events, but most of them had names related to the words *air* or *oxygen*. Distinguishing between the various LLCs is not important for purposes of this order, and the Court will therefore generically refer to the PEO business involved and the LLCs that effectuated it as "AIR."

Sly and other AIR investors (who, like Sly, invested indirectly through trusts or business arrangements) had acquired a worker's compensation insurance company and wanted to expand its operation.  Expanding its business, however, required increased funds to hold as insurance reserves that would support AIR's business operations.  The parties dispute who initiated the conversations surrounding investment in AIR and the way in which Kingsley became familiar with AIR, but those facts are largely immaterial for the purposes of this Order.  It is undisputed that at some point, Kingsley became interested in investing in AIR and that he attended an AIR investor meeting in March 2008.  At that meeting, and subsequently, Sly and Kingsley discussed the AIR business model.

The main actor behind AIR, and Sly's business partner in AIR and in other investments, was Wilbur Anthony Huff.  Huff controlled most of AIR's activities and played an active role in managing its investments.  Kingsley also became familiar with

Charles J. Antonucci, who was the President of Park Avenue Bank, where AIR held its funds.

Sly was AIR's secretary, and performed administrative tasks for the company. Sly prepared three documents titled "Risk Disclosures" for AIR, one in February 2008, one in May 2008, and one in July 2008 (the Risk Disclosures). The Risk Disclosures contained text that said the documents were produced only for "Accredited Investors" who were interested in AIR. At some point, Sly gave Kingsley the Risk Disclosures as part of Kingsley's consideration of the investment. In the Risk Disclosures, Sly made a number of assertions about the nature of the AIR investment and about his business relationship with Huff. The parties vehemently dispute the extent to which Sly disclosed the risks involved in investing in AIR and the extent to which Huff had a history of unsavory business practices. Those disputes are at the heart of these Motions, but the particular details of each dispute are not relevant to the Court's Order and so are omitted here.

Following the March 2008 AIR investor meeting, Kingsley and Sly met several times to discuss the AIR investment and, in the process, reviewed the Risk Disclosures and discussed Kingsley's concerns about the investment. Kingsley carefully read the Risk Disclosures and discussed their contents with Sly in those meetings. Kingsley also began a process of due diligence in March 2008 to investigate the risks of an AIR investment.

After a meeting with Sly in May 2008, Kingsley decided not to invest in AIR despite Sly's promptings. Kingsley then began to investigate other investment opportunities. After one of those other opportunities fell through, however, Kingsley began to think again about investing in AIR. To resolve his concerns about the AIR business model and the risk involved in investing, Kingsley began to talk directly to Huff about new ways to structure the investment in May 2008.

Through his discussions with Huff, Kingsley devised a new structure for investment in AIR that he believed would minimize the risk of the investment. In

exchange for his purchase of 1,750,000 "preferred units" of AIR, at a price of $1 per unit, Kingsley negotiated a series of collateral guarantees from Huff.  First, Huff agreed to provide put options backing Kingsley's investments by which a separate entity Huff controlled, SDH realty, would agree to purchase the entire amount of Kingsley's investment in AIR if Kingsley invoked the options (the Put Options).

If for some reason Huff did not purchase all of Kingsley's units of AIR at the price Kingsley paid, Kingsley negotiated a second level of security through letters of credit. Huff agreed to provide the letters of credit at Park Avenue Bank (the Letters of Credit) such that if Kingsley invoked the Put Options and Huff refused to pay the full purchase amount, Kingsley would be able to draw the full amount from the Letters of Credit he believed to be backed by funds at Park Avenue Bank.  Further, Huff agreed that River Falls, the entity that issued all payment checks to AIR investors, would pay Kingsley, through Kingsley Consulting LLC, an annual salary of $175,000 salary to perform consulting work related to the PEO business.

Kingsley negotiated all of these additional terms directly with Huff.  With these additional terms agreed to, Kingsley decided to invest in AIR and sent $1,750,000 to an account owned by AIR at Park Avenue Bank in exchange for 1,750,000 preferred units of AIR backed by the additional guarantees from Huff (the AIR transaction).  Sly did not know about all of the aspects of the AIR transaction.  Kingsley specifically directed Huff not to inform Sly about the Put Options and the Letters of Credit.  Kingsley also specifically instructed Huff's accountant on how to respond to inquiries from Sly without revealing the full nature of the transaction by omitting certain terms.

Not long after investing in AIR, Kingsley began to fear he would lose his investment.  He learned, for instance, that Antonucci's Park Avenue Bank was not well-capitalized and that Huff allegedly intended to invest $5 million to shore it up.  Antonucci later left Park Avenue Bank, which failed, and Antonucci has since pleaded guilty to

bank fraud.[1]  The bank's failure doomed the Letters of Credit.  Soon thereafter, the entire AIR operation began to unravel as it became clear that the underlying investment scheme was fraudulent and consisted only of Huff's hot air.  Huff was later indicted for thirteen counts of wire, bank, and tax fraud, bank robbery, and other fraudulent activities involving AIR and Park Avenue Bank.[2]  AIR deflated, and this lawsuit followed.

## II.    Legal Standard

A party moving for summary judgment must demonstrate that there is no genuine issue as to any material fact in order to be entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A material fact is one that might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant has the burden of showing the absence of genuine issues of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

However, once the movant meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion.  The party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial," and may not rest upon the pleadings.  *Anderson*, 477 U.S. at 256.  As a result, the opposing party may not simply describe a fact as disputed to defeat summary judgment; rather, the nonmoving party must produce sufficient evidence in their favor for a jury to return a verdict for that party.  *Id*. at 249.

At the summary judgment stage, the nonmoving party's evidence is presumed true, and all inferences from the evidence are drawn in the light most favorable to the non-moving party.  *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 864 (9th Cir. 2009).  As a result, a court does not make credibility determinations or weigh conflicting evidence at this stage.  *Porter v. California Dep't of Corr.*, 419 F.3d

---

[1] *United States v. Antonucci*, No. 1:10-cr-00922-NRB (S.D.N.Y.).

[2] *United States v. Huff*, No. 1:12-cr-00750:1-NRB (S.D.N.Y.).

885, 891 (9th Cir. 2005).   However, the Ninth Circuit has refused to find a "genuine issue" where the only evidence presented is "uncorroborated and self-serving" testimony. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citing *Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1481 (9th Cir. 1996)).

## III.   Analysis

The threshold issue presented in these cross motions for summary judgment is whether Plaintiffs' AIR transaction constitutes a security at all.   In order to make out a claim under Arizona securities laws, investors must demonstrate that promoters' alleged misconduct occurred in connection with the purchase or sale of a "security."   Defendants contend that they are entitled to summary judgment on all of Plaintiff's claims under the Arizona Securities Act because Plaintiffs' AIR transactions were not "securities" as a matter of law.

### A.   Composition of Plaintiffs' AIR transaction

The focus of a court's inquiry should be "on what the purchasers were offered or promised" by evaluating "the character of the instrument or transaction offered on what the purchasers were led to expect."   *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (citations and internal quotation marks omitted).

Kingsley understood the transaction he was agreeing to make to be an investment in AIR, collateralized by the Put Options from SDH Realty, in turn secured by the Letters of Credit from Park Avenue Bank, along with the consulting agreement.   (Doc. 373-1 at 288.)   For the purposes of this Motion, then, the transaction that must be characterized is the entire transaction, including the Put Options, Letters of Credit, and the consulting agreement, because Kingsley was led to expect that those were the terms when he decided to enter into the AIR transaction.

### B.   Characterization of Plaintiffs' AIR Transaction

Whether a transaction constitutes a "security" is ultimately a question of law. *Nutek Information Systems v. Arizona Corp. Com'n*, 194 Ariz. 104, 107, 977 P.2d 826, 829 (Ct. App. 1998).   The characterization of a transaction, however, raises questions of

both law and fact and the ultimate question is "whether or not a particular set of facts, as resolved by the factfinder, constitutes a [security]" as a matter of law. *United States v. Carman*, 577 F.2d 556, 562 (9th Cir. 1978). When there are disputes of material fact as to the nature of the underlying facts surrounding a transaction, therefore, the characterization of the transaction is properly within the province of the jury and summary judgment on the characterization of the transaction would be inappropriate.

In Arizona, a "security" is defined as:

> any note, stock, treasury stock, bond, commodity investment contract, commodity option, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, viatical or life settlement investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas or other mineral rights, real property investment contract or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

A.R.S. § 44-1801(26). Because Arizona's definition of security is substantially similar to the federal definition of securities in the Securities Act of 1993, 15 U.S.C. § 77b(a)(1), Arizona courts look to federal courts for guidance in interpreting the Arizona Securities Act unless there is good reason to depart from federal authority. *Sell v. Gama*, 231 Ariz. 323, 295 P.3d 421, 425 (2013).

Under both federal and Arizona law, then, the term "security" is defined broadly, and that definition is in turn construed liberally by the courts. *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 481 (9th Cir. 1973). The definition of a security thus "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). Of all the terms included in the statutory definition of security, "investment contract" is the broadest and can encompass the widest variety of transactions. As a result, the Court's characterization of Plaintiffs' AIR transaction will evaluate whether, as a matter

of law, there is a genuine dispute of fact the transaction constituted "investment contracts" under A.R.S. § 44-1801(26).

### 1. The *Howey* Test

In *Howey*, the Supreme Court developed a three-prong test to determine whether an investment contract is a "security:" it is a security if it involves (1) an investment of money, (2) in a common enterprise, (3) with the expectation that profits will be earned solely from the efforts of others.  328 U.S. at 301; *accord Nutek*, 194 Ariz. at 108, 977 P.2d at 830.  In applying the three-prong *Howey* test in light of the flexible definition of a "security," "substance controls over form."  *Nutek*, 194 Ariz. at 108, 977 P.2d at 830.  Because the *Howey* test employs an objective standard, to determine whether a transaction is an investment contract "[t]he transaction must be characterized at the time when it transpired."  *Daggett v. Jackie Fine Arts, Inc.*, 152 Ariz. 559, 565, 733 P. 2d 1142, 1148 (Ct. App. 1986).  "[W]hat actually occurred, or in speculation what could have occurred, following the transaction is immaterial."  *Id.*; *accord First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Trust Co., N.A.*, 919 F.2d 510, 516 (9th Cir. 1990).

The parties here dispute whether any of the prongs of the *Howey* test have been established, but do not dispute that the *Howey* test is the appropriate one for determining whether Plaintiffs' AIR transactions were securities.  To determine whether Plaintiffs' AIR transactions represent a security, the Court must therefore characterize the transaction at the time it was completed, in July 2008, based on what Kinglsey was led to expect at that time.

### a. Investment of Money

On July 17 and 18, 2008, the various Plaintiffs deposited $1,750,000 into an account at Park Avenue bank held by "Oxygen Unlimited II, LLC."  (Doc. 370-4 at 4-6.) For the purposes of the first prong of the *Howey* test, "an 'investment of money' means only that the investor must commit his assets to the enterprise in such a manner as to subject himself to financial loss."  *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976) (citing *El Khadem v. Equity Securities Corp.*, 494 F.2d 1224 (9th Cir. 1974)).  Kingsley

invested money as part of the AIR transaction when he wired funds to the Park Avenue Bank, so the first prong of the *Howey* test is satisfied.

### b.      Common Enterprise

The second prong of the *Howey* test requires that a transaction involve a common enterprise.  Though a majority of cases evaluating whether a transaction constitutes a security turn on whether the third prong has been met, a transaction does not satisfy the *Howey* test if the second prong has not been met.  *Daggett*, 152 Ariz. at 565, 733 P. 2d at 1148.  In Arizona, if a transaction satisfies either a test for either horizontal or vertical commonality, it satisfies the second prong of the *Howey* test.  *Daggett*, 152 Ariz. at 566, 733 P. 2d at 1149.  Horizontal commonality occurs where a group of investors pool their assets and "give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise."  *Hocking v. Dubois,* 885 F.2d 1449, 1459 (9th Cir. 1989).  To meet the horizontal community test, a group of investors must pool their assets to "make their collective fortunes dependent on the success of a single common enterprise."  *Id*.

But Arizona has no strict requirement that funds must be pooled in order to establish the existence of a common enterprise; where there is no pooling, an investor can show vertical commonality instead.  *Daggett*, 152 Ariz. at 566, 733 P. 2d at 1149.  Vertical commonality is "an enterprise common to an investor and seller, promoter, or some third party" and can be shown when "the fortunes of the investors are linked with those of the promoters."  *SEC v. R.G. Reynolds Ent., Inc.,* 952 F.2d 1125, 1130 (9th Cir. 1991).  One indicator of vertical commonality is an arrangement to share profits on a percentage basis between the investor and the seller or promoter.  *Id*.

In this case, Plaintiffs appear to rely on the horizontal commonality test.  Plaintiffs assert that their money was pooled with other money of AIR investors.  (Doc. 370 ¶34(d), Doc. 388 at 5.)  When Plaintiffs' AIR transaction is considered as a whole—the way that Kingsley understood it at the time he made the decision to invest— there is a genuine dispute of material fact as to whether Plaintiffs pooled their funds in a common

enterprise.  There is evidence that Kingsley negotiated for himself a transaction in which he received preferential terms not available to other AIR investors that he believed ensured himself a return independent of AIR's performance.  Kingsley also sent his funds to an account at Park Avenue Bank different from the account used by other AIR investors, but still owned by AIR.  As a result, there is a genuine dispute of fact whether Plaintiffs' AIR transaction satisfies the second prong of the *Howey* test.

### c. Expectation of Profits From Efforts of a Third Party

Even if Plaintiffs could satisfy the second prong, however, there is a genuine dispute of fact as to whether the AIR transaction is a security on the third and final prong of the *Howey* test.  The third prong requires that an investor have an expectation of profits which would be produced through the efforts of others.  Arizona and the Ninth Circuit both modify the *Howey* language such that it is not required that the profits be produced "solely" through the efforts of a third party.  *Nutek*, 194 Ariz. at 108, 977 P.2d at 830.  Rather, the third requirement is met when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *Glenn W. Turner*, 474 F.2d at 482.  In evaluating whether the efforts of a third party are the significant ones, courts must consider the transaction as a whole.  *Nutek*, 194 Ariz. at 109, 977 P.2d at 831.  The degree of experience and knowledge of the investor and the promoter's managerial skill are relevant to determining practical ability to control.  *S.E.C. v. Rubera*, 350 F.3d 1084, 1093 (9th Cir. 2003).

When an investor elects to delegate control over funds but is able to retain control over them at any time, the third requirement of *Howrey* may not be established.  *Hocking v. Dubois*, 885 F.2d 1449, 1460 (9th Cir. 1989).  The question of an investor's control is decided in terms of practical as well as legal ability to control.  *Id.*  When an investor maintains the ability to regain control over an investment as a legal matter, the investor must show practical dependence in order to meet the third *Howrey* prong.  An investor can make such a showing by establishing an inability to exercise meaningful powers of

control over the investment such that the efforts of a third party are essential to the success of the investment. *Id.* When investors can pull out of the larger enterprise and still receive the income they had contemplated when they made the investment, however, the third prong is not met. *Koch v. Hankins*, 928 F.2d 1471, 1480 (9th Cir. 1991).

In this case, Kingsley specifically structured the investment so that he retained some control over the funds. Kingsley described his understanding of the transaction as one in which the trust would have to be "bilateral," and that Kingsley retained management control over the Put Options because he could force Huff to perform on the Put Options using the Letters of Credit. (Doc. 373-1 at 386.) In addition, the consulting agreement, which Huff offered as an inducement for Kingsley to invest in AIR, paid Kingsley $175,000 a year in salary to performing consulting work related to the PEO business. (Doc. 373-4 at 84-89.) It is undisputed that Kingsley knew nothing about the PEO industry and that none of his consulting work resulted in any benefit to AIR. (*Id.* ¶72, Doc. 372 at 33, ¶72.)

It is genuinely disputed, however, whether these facts mean that Kingsley did not expect profits based on the efforts of a third party. The consulting agreement was also intended to provide Kingsley enough money to pay for the borrowing costs he incurred in refinancing his two houses to fund the AIR transaction, not necessarily to ensure profit. Further, Kingsley's practical ability to exercise control over the AIR investment is heavily disputed. As a result, there is genuine dispute as to whether the third prong of the *Howey* test has been satisfied.

## 2. Results of the *Howey* Test

There are disputed facts in this case that are material to both the second and third prongs of the *Howey* test. As a result, Plaintiffs have not shown that their AIR transaction was a security as a matter of law. Plaintiffs' Motion for Summary Judgment on its claim under the Arizona Securities Act must therefore be denied because they cannot show that they are entitled to judgment as a matter of law. To the extent that Defendants' Motion for Summary Judgment depends on their contention that the AIR

transaction was not a security as a matter of law, their Motion will also be denied. Plaintiffs' contention that the AIR transaction is a security may not survive judgment as a matter of law at trial after all of the evidence has been presented.  But on the record on these Motions, the Court cannot say that Defendants are entitled to summary judgment on that ground.  Because Defendants also move for summary judgment on the merits of each count of Plaintiffs Amended Complaint, those counts are addressed independently below.

C.    **Count I: Fraud in the Sale of Securities, A.R.S. §44-1991(A)**

Defendants move for summary judgment on Plaintiffs' first count, for fraud in the sale of securities.  The Arizona Securities Act, A.R.S. § 44-1991(A), makes it unlawful for a person, in connection with the sale or purchase of securities, to do any of the following:

(1) Employ any device, scheme or artifice to defraud.

(2) Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

(3) Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

Defendants first contend that they are entitled to judgment on these claims because Sly was not involved in the AIR transaction that Plaintiffs ultimately agreed to make.  In Arizona, the purchaser of a security may bring an action for violation of § 44-1991, through A.R.S. § 44-2001, "against any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase, and such persons shall be jointly and severally liable to the person who is entitled to maintain such action." A.R.S. § 44-2003(A).  In order to be entitled to summary judgment on these grounds, Defendants must therefore show that there is no dispute of fact that they did not make, participate in, or induce the AIR transaction.  There is, however, ample evidence in the record from which a reasonable jury could conclude that Sly participated in the AIR transaction.

Defendants next argue that, even if Sly did induce or participate in the AIR transaction, Plaintiffs have not raised sufficient evidence to create a dispute about whether Sly's statements could be fraudulent under § 44-1991(A).  Under subsection (2) of that section, Sly would be liable for any untrue statements or omissions of fact in the sale of securities as long as the statement or omission is both misleading and material to the transaction, regardless of whether he knew the falsity of the statements.  *Aaron v. Fromkin*, 196 Ariz. 224, 227, 994 P.2d 1039, 1042 (Ct. App. 2000).  The materiality of any alleged misstatement or omission Sly made to Kingsley depends on whether the statement or omission "would have assumed actual signification in the deliberation of the reasonable buyer."  *Rose v. Dobras*, 128 Ariz. 209, 214, 624 P.2d 887, 892 (Ct. App. 1981).  There is a genuine dispute of fact about both the truth of Sly's statements in this case and whether those alleged misstatements and omissions were material to Kingsley's decision to invest.

Next, Defendants argue that they are entitled to summary judgment because Plaintiffs cannot prove scienter.  Under both subsection (1) and (3) of § 44-1991(A), Plaintiffs must show scienter—that Sly acted with the intent and purpose to defraud Kingsley.  Defendants' argument is that Plaintiffs have failed to introduce any evidence supporting any motive for Sly to mislead Plaintiffs and that Plaintiffs already knew whatever negative information about Huff that Sly knew.  However, the truth of what Sly told Kingsley is very much in dispute in this case, and the Court does not weigh the credibility of competing claims at the summary judgment stage.  From the evidence presented, there is a genuine dispute about both whether Sly made misstatements or omissions and whether he knowingly did so to defraud Kingsley.  As a result, Defendants' Motion for summary judgment on Count I will be denied.

### D.      Count II: Aiding and Abetting Fraud in the Sale of Securities

Arizona no longer recognizes a cause of action for aiding and abetting liability under the Arizona Securities Act.  *Sell v. Gama*, 231 Ariz. 323, 295 P.3d 421, 428 (2013).

Plaintiffs do not dispute that this claim is no longer viable under Arizona law.  As a result, Defendants are entitled to judgment as a matter of law on Count II.

### E.      Count III: Material Misstatements of Fact in a Prospectus or Oral Communication, A.R.S. § 44-1998(A)

In Count III, Plaintiffs allege that Defendants' Risk Disclosures were prospectuses and that, in those documents, Defendants omitted to state material facts necessary to make the statements in the documents not misleading.  The Arizona Securities Act provision at issue imposes liability upon: "any person who offers or sells a security by means of a prospectus or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading."  A.R.S. § 44-1998(A).  But a person is only liable for a misrepresentation under A.R.S. § 44-1998(A) if "the purchaser did not know of the untruth or omission."

Defendants contend that summary judgment is appropriate on this count as distinct from the others because the Risk Disclosures were not prospectuses such that § 44-1998(A) simply does not apply.  Plaintiffs argue, in passing, that Defendants may have made an oral communication, but the facts they cite in support of that argument are insufficient to raise a genuine dispute that Defendants offered or sold a security by means of oral communication.  (Doc. 387 at 113, ¶¶ 21, 22, 24, 78.)  The core of the dispute on Count III is thus whether Defendants' Risk Disclosures would qualify as prospectuses under Arizona law.  If the Risk Disclosures were prospectuses, then there would be a factual dispute about whether the Risk Disclosures included untruths or omissions and, if they did, whether Plaintiffs knew or could have known "in the exercise of reasonable care" about the untruth or omission.  As a matter of law, however, the Risk Disclosures were not prospectuses within the meaning of § 44-1998(A).

The parties have not identified any Arizona state precedent interpreting the term "prospectus" as used in the provision and the Arizona Securities Act does not define the term.  Another court in this District has, however, persuasively interpreted the phrase in

light of United States Supreme Court precedent, and the Court adopts that analysis here. In *Ortholgic Corp. v. Columbia/HCA Healthcare Corp.*, the court noted that A.R.S. § 44-1998(A) "is identical in all relevant respects to the language of" § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(2), its federal counterpart.  No. CIV-01-0006-PHX-SRB, 2002 WL 1331735, *7 (D.Ariz. Jan. 7, 2002).  As a result, the Court applied the United States Supreme Court's interpretation of § 12(2) in *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 584 (1995), to A.R.S. § 44-1998(A).  *Gustafson* held that "the word 'prospectus' is a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder."  531 U.S. at 584.  Applying that interpretation to Arizona law, the term "prospectus" as used in § 44-1998(A) "is a term of art" and "was not intended to be interpreted beyond its commonly understood meaning and usage as a term of art."  *Ortholgic*, 2002 WL 1331735 at *8.

The Risk Disclosures at issue in this case are not "public offerings of securities" and so are not, as a matter of law, prospectuses.  Because Plaintiffs have not established any facts that show that there was a public offering of securities in this case, they have not raised genuine dispute as to whether Defendants have violated A.R.S. § 44-1998(A). As a result, Defendants are entitled to judgment as a matter of law on Count III.

### F.     Count IV: Control Person Liability, A.R.S. § 44-1999(B)

On Count IV, Defendants move for summary judgment on the grounds that Sly did not control the actions of Huff when Huff violated securities law.  The Arizona Securities Act attaches vicarious or secondary liability to "controlling persons" as it does to a person or entity that commits a primary violation of §§ 44–1991 or 1992.  A.R.S. § 44–1999(B).  Section 44–1999(B) imposes presumptive liability for "[e]very person who, directly or indirectly controls any person liable for a violation of §§ 44–1991 or 44–1992 . . . ."  That section "by its terms imposes only secondary liability; a 'control' person is not liable under that statute unless the controlled entity is itself also liable."  *Grand v. Nacchio*, 225 Ariz. 171, 176, 236 P.3d 398, 403 (2010).  In this case, Plaintiffs argue that Sly had the power to control Huff's activities when Huff was violating securities laws,

- 15 -

and so should be secondarily liable for those violations.

Arizona courts have held that controlling person need not have actually participated in the specific action upon which the securities violation is based. *E. Vanguard Forex, Ltd. v. Arizona Corp. Comm'n*, 206 Ariz. 399, 412, 79 P.3d 86, 99 (Ct. App. 2003). Rather, the person targeted as a controlling person must have "had the legal power, either individually or as part of a control group, to control the activities of the primary violator." *Id.* A controlling person is not liable, however, if he "acted in good faith and did not directly or indirectly induce the act underlying the action." A.R.S. § 44-1999(B).

Defendants contend that Sly did not control any of Huff's activities and that the evidence shows that it was Huff who controlled all aspects of AIR. To dispute that contention, Plaintiffs point to the testimony of Danny Pixler, who was also involved in the AIR transaction. According to Plaintiffs, Pixler's testimony that Sly had the ability to control Huff because Huff controlled the investor money is sufficient to defeat summary judgment on Count IV. Pixler's testimony does not, however, support the proposition that Sly had the ability to control Huff. Rather, Pixler testified that because Sly was providing the investor's funds, Huff wanted to keep Sly happy by doing what Sly asked on the surface. (Doc. 387-1 at 25.) But Pixler was clear that Huff did whatever he wanted to do with those funds behind the scenes, without Sly's knowledge. (*Id.*) Plaintiffs have not identified any other evidence to support their claim that Sly had the legal power to control Huff .

Instead, the evidence reflects that Sly had no legal or practical ability to control Huff and that Huff controlled all aspects of AIR. Indeed, Plaintiffs were able to negotiate and structure the terms of their own AIR investment directly with Huff without the knowledge or consent of Sly or any other AIR investor. In their own Amended Complaint, Plaintiffs asserted that Huff was the "principal owner and operator" of AIR, and that Huff "had power, directly or indirectly, to control the activities" of Sly and

Defendants.   (Doc. 1-3 at 44 ¶208.)   Because Plaintiffs have introduced no contrary evidence that could create a genuine dispute about Sly's ability to control Huff, Defendants are entitled to judgment as a matter on Count IV.

### G.   Count V: Common Law Fraudulent Concealment

Defendants move for summary judgment on Count V because they contend that Plaintiffs have failed to introduce evidence that Defendants intentionally concealed any material fact.  A fraud claim requires proof that the defendant made "a false and material representation, with knowledge of its falsity or ignorance of its truth, with intent that the hearer would act upon the representation in a reasonably contemplated manner," and that the plaintiff, "ignorant of the falsity of the representation, rightfully relied upon the representation and was thereby damaged."  *Lerner v. DMB Realty, LLC*, 231 Ariz. 297, 294 P.3d 135, 140 (Ct. App. 2012) (citing *Dawson v. Withycombe*, 216 Ariz. 84, 96, 163 P.3d 1034, 1046 (App. 2007)).  As discussed above, there is a genuine dispute in this case about whether Huff made misstatements or omissions and whether Plaintiffs already knew the true facts about any misstatement or omission.  In addition, "[q]uestions about materiality and reasonable reliance . . . usually are for the jury," because they inherently involved issues of credibility and weight of evidence.  *Lerner*, 231 Ariz. 297, 294 P.3d at 141.  The disputed facts in this case go directly to materiality and reasonable reliance, and should be left for the jury to weigh.  Defendants' Motion for summary judgment on Count  V will therefore be denied.

### H.   Count VI: Common Law Negligent Misrepresentation

A claim for relief for negligent misrepresentation is one governed by the principles of the law of negligence.  Thus, there must be a duty owed and a breach of that duty before a plaintiff can pursue a claim for negligent misrepresentation.  *Van Buren v. Pima Cmty. Coll. Dist. Bd.*, 113 Ariz. 85, 87, 546 P.2d 821, 823 (1976).  In Arizona, a claim for negligent misrepresentation is governed by § 552 of the Restatement (Second) of Torts. *Donnelly Const. Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 188, 677 P.2d 1292, 1296 (1984).  Section 552 of the Restatement subjects a person to liability when he "in the

course of his business . . . supplies false information for the guidance of others in their business transactions . . . if he fails to exercise reasonable care or competence in obtaining or communicating the information."   Restatement (Second) of Torts § 552 (1977).  Liability only attaches under § 552 if the plaintiff justifiably relies on the false information and suffers pecuniary loss caused by the reliance.  *Id.*

Defendants argue that Sly did not owe any duty to Kingsley because Sly did not have any fiduciary relationship with Plaintiffs.  As § 552 of the Restatement makes clear, however, there is a duty to provide true information in the guidance of others in their business transactions.  There is evidence that Sly presented Kingsley, through the Risk Disclosure and other communications about the AIR transaction, with guidance about investing in AIR.  As a result, Defendants are not entitled to judgment as a matter of law that they had no duty to Plaintiffs.  Further, as in the claim for fraudulent concealment, the questions of whether the information Sly supplied was false, whether Kingsley justifiably relied on that information, and whether Kingsley suffered loss proximately caused by that reliance all involved disputed factual issues.  As a result, Defendants' Motion for summary judgment will be denied as to Count VI.

## I.   Count VII: Consumer Fraud Violation, A.R.S. § 44-1522

Finally, Defendants move for summary judgment on Count VII, Plaintiffs' claim under the Arizona Consumer Fraud Act, A.R.S. § 44-1522(A).  That Act prohibits the use of "any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise."  A.R.S. § 44-1522(A).  To establish a violation of the Arizona Consumer Fraud Act, a plaintiff must show a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and consequent and proximate injury resulting from the false promise.  *Kuehn v. Stanley*, 208 Ariz. 124, 129, 91 P.3d 346, 351 (Ct. App. 2004) (citation omitted).  An injury occurs when a consumer relies, even unreasonably, on false or misrepresented information.  *Id.*

For the purposes of the Consumer Fraud Act, "merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate or services."  A.R.S. § 44–1521(5).  The majority of jurisdictions that have confronted the question whether their unfair trade practices act applies to securities transactions have held that securities transactions are *not* covered under the state's unfair trade practices act.  *See Wyman v. Prime Disc. Sec.*, 819 F. Supp. 79, 87 n.14 (D. Me. 1993) (collecting variety of state court authorities).  Arizona courts, however, construe the term "merchandise" broadly in light of the "broad definition of merchandise, covering both tangibles and intangibles, and the broadly remedial purposes of the legislation."  *Villegas v. Transamerica Fin. Servs., Inc.*, 147 Ariz. 100, 102, 708 P.2d 781, 783 (Ct. App. 1985).  The Supreme Court of Arizona has interpreted a 1981 amendment to the Consumer Fraud Act to reflect the legislature's intent for "the consumer fraud act to provide an additional avenue of relief to those aggrieved by securities act violations."  *State ex rel. Corbin v. Pickrell*, 136 Ariz. 589, 592, 667 P.2d 1304, 1307 (1983).  As a result, any fraud in the sale of securities is also actionable under the Arizona Consumer Fraud Act.  *Id.*

The result of the *Pickrell* decision is that, in Arizona, fraud in the sale of securities that would be actionable under A.R.S. § 44-1991 is also actionable under the Consumer Fraud Act.  There is a genuine dispute of fact as to whether Sly made a misrepresentation in connection with Plaintiffs' AIR transaction and as to whether a consequent and proximate injury resulted from the false promise.  As a result, for the same reasons that the Court denied Defendants' Motion for summary judgment on Count I, summary judgment on Count VII will also be denied.

## IV.   Remaining Issues Before Trial

Defendants first moved to disqualify Plaintiffs' counsel, Mr. Conant, on January 23, 2013, on the basis that he is a necessary and material witness at trial.  (Doc. 294.)  The Court denied that Motion without prejudice to Defendants' ability to re-urge the motion at oral argument on February 22, 2013.  (Doc. 330.)  In an Order of March 13, 2013, the Court reiterated its view that the question of whether Mr. Conant should be

disqualified was best resolved after motions for summary judgment were decided.  (Doc. 341.)  Because this Order resolves the motions for summary judgment, the question of whether Mr. Conant's testimony is necessary and whether any such testimony would be outside the scope of attorney-client privilege is now ripe.

Defendants will be ordered to provide the Court briefing on those questions, should they elect to do so, by August 14, 2013.  Defendants are instructed that any briefing should address specific, concrete, factual questions about which Mr. Conant's testimony would be material and why those questions could not be answered through other admissible evidence.  The list of topics of Mr. Conant's testimony from the January 23, 2013 Motion (Doc. 294 at 8), for example, is too broad to be helpful to the Court. Defendants should resist the urge to convert this briefing into a list of generalized grievances about Mr. Conant's role in the AIR transactions.  Rather, the focus should be on specific testimony Defendants hope to illicit, why that testimony must come from Mr. Conant, and the reasons Defendants believe that specific testimony is not subject to attorney-client privilege.

To the extent that Defendants are not able to articulate specific reasons the privilege does not apply because of uncertainty arising from the scope of the attorney-client privilege in this case, Defendants should highlight that uncertainty in specific, concrete terms.  Broad statements addressing confusion about whether Mr. Conant represented Plaintiffs or Kinglsey individually will not assist the Court.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 369) is denied.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment or Alternatively for Partial Summary Judgment (Doc. 371) is granted as to Counts II, III, and IV.  Plaintiffs remaining claims are Counts I, V, VI, and VII.

IT IS FURTHER ORDERED that Defendants submit briefing, not to exceed 15 pages, regarding disqualification of Mr. Conant, if they elect to do so, by August 14,

2013.  Plaintiffs may submit a response, not to exceed 10 pages, if they elect to do so, by August 21, 2013.  Defendants may then submit a reply, not to exceed 5 pages, by August 26, 2013.

IT IS FURTHER ORDERED that the parties' deadline to submit their Joint Final Pretrial Order is extended to August 20, 2013.  The deadline to file and serve all motions in limine is extended to August 16, 2013, with responses to motions in limine to be filed by August 26, 2013.  The other deadlines and the trial date from the Court's Scheduling Order (Doc. 386) remain firm.

Dated this 2nd day of August, 2013.

_____
Neil V. Wake
United States District Judge